In the Matter of JULE FINK, Respondent, against ASHLEY T. Cole et al., Constituting the Racing Commission of the State of New York, Appellants.

First Department, May 10, 1955.

*Samuel A. Hirshowitz* of counsel (*Henry S. Manley* with him on the brief; *Jacob K. Javits, Attorney-General*, attorney), for appellants.

*Charles H. Tuttle* of counsel (*Moses Polakoff* with him on the brief; *Moses Polakoff*, attorney), for respondent.

BASTOW, J.   The State Racing Commission appeals from an order remanding the proceeding to that body for further consideration.   On June 10, 1954, the petitioner filed with the commission an application for an owner's racing license for 1954. Eight days later, the application was denied in a brief communication which stated that " [a]t a meeting of the Commission held this date, your application for an owner's license for the year commencing April 1, 1954 was denied."

This proceeding was commenced on August 2, 1954.   In the petition, it is alleged, among other things, that the action of the commission in denying the application was arbitrary and capricious.   Seven days later and before filing its answer, the commission, in what it states in its answer to be " in the interest of proper record," wrote the petitioner stating " that the grounds of refusal were your failure to meet the standards set forth by Section 7512 of the Unconsolidated Laws [L. 1926, ch. 440, § 9-b, as added by L. 1951, ch. 324]."

This section of the Unconsolidated Laws was enacted by section 4 of chapter 324 of the Laws of 1951, which at the same time repealed former section 9-b (added by L. 1934, ch. 310, § 5, as amd.) which had been declared unconstitutional in *Matter of Fink* v. *Cole* (302 N. Y. 216). Prior to the 1951 amendment, the Legislature, by the provisions of section 9-b, had delegated to the Jockey Club — a private corporation — the power to license owners of horses, trainers and jockeys at running races, pursuant to which the Jockey Club had empowered its stewards to grant or refuse such licenses at their discretion. In *Matter of Fink* v. *Cole* (*supra*) the court held that the delegation by the Legislature of its licensing power to the Jockey Club was such an abdication as to be patently an unconstitutional relinquishment of legislative power in violation of section I of article III of the State Constitution. It was further held that " [e]ven if the Legislature's power to license had been delegated to a governmental agency, the statute now challenged would have to be stricken down for lack of guides and proper standards." (P. 225.) The court did not remit the proceeding for the obvious reason that there was no legally constituted authority to which the proceeding could be returned.

Twenty-one days after this decision of the Court of Appeals was handed down, the new statutory provision — to which reference has been made — was enacted by section 4 of chapter 324 of the Laws of 1951. This statute (§ 9-b) placed the licensing power in the State Racing Commission. It established certain conditions in the following language: " If the state racing commission shall find that the financial responsibility, experience, character and general fitness of the applicant are such that the participation of such person will be consistent with the public interest, convenience or necessity and with the best interests of racing generally in conformity with the purposes of this act, it shall thereupon grant a license. If the commission shall find that the applicant fails to meet any of said conditions, it shall not grant such license and it shall notify the applicant of the denial." (§ 9-b, subd. 2.) The Attorney-General suggests in his brief and examination confirms the suggestion that this provision was modeled after the licensed check cashers' statute (Banking Law, § 369; L. 1944, ch. 593, as amd.).

Unlike the former section, certain standards are established by the new section. It is provided that " [t]he commission may refuse to issue or renew a license, or may suspend or revoke a license issued pursuant to this section, if it shall find that the applicant * * * has been convicted of a crime in any juris-

diction, or is or has been associating or consorting with any person who has or persons who have been convicted of a crime or crimes in any jurisdiction or jurisdictions, or is consorting or associating with or has consorted or associated with book-makers, touts, or persons of similar pursuits, or has himself engaged in similar pursuits, or is financially irresponsible, or has been guilty of or attempted any fraud or misrepresentation in connection with racing, breeding or otherwise, or has violated or attempted to violate any law with respect to racing in any jurisdiction or any rule, regulation or order of the commission, or shall have violated any rule of racing which shall have been approved or adopted by the commission, or has been guilty of or engaged in similar, related or like practices.''

It is against this statutory background that we turn to a brief recital of the facts. The petitioner, Fink, had been granted an annual owner's racing license from 1944 to 1949. His applications for a license for the years 1949 and 1950 were denied by the Jockey Club. The review procedure then in effect provided in part that '' [u]pon the application to the state racing commission of a person whose license has been refused or revoked * * * such person shall be entitled to a prompt hearing before a joint session of the state racing commission and two stewards of the Jockey Club ''. (L. 1926, ch. 440, § 9-b, as amd. by L. 1947, ch. 196.)

Thereafter, Fink, while protesting the unconstitutionality of the Jockey Club's licensing power, demanded a hearing before the joint board. Such a hearing was had and testimony given by several witnesses. The board sustained the action of the Jockey Club and made the determination '' that it would be detrimental to the best interest of racing for an owner's license to be issued to the applicant ''. This was a standard set by the rules of the Jockey Club and, as stated, no standards were set by the statute. In a proceeding to review this determination, the Court of Appeals struck down the licensing statute as unconstitutional. In so doing, the court annulled the determination of the joint board. (*Matter of Fink* v. *Cole, supra.*)

Some five years later in June, 1954, Fink again applied for an owner's license. This application, as heretofore stated, was simply denied. The subsequent communication stated that the grounds of refusal were the failure of Fink to meet the standards set forth in section 7512 of the Unconsolidated Laws (L. 1926, ch. 440, § 9-b, as added by L. 1951, ch. 324, § 4). This section, however, sets forth many standards. Thus, affirmatively, the commission must find before granting a license that (a) the

financial responsibility; (b) the experience; (c) the character; and (d) the general fitness of the applicant are such that his participation in racing will be consistent with (1) public interest; (2) convenience and necessity; and (3) the best interests of racing generally in conformity with the purposes of the act. On the negative side, the commission may refuse to issue a license if it shall find (1) that " the applicant, or any person who is a partner, agent, employee or associate of the applicant, has been convicted of a crime in any jurisdiction "; or (2) that the applicant " has been associating or consorting with any person who has or persons who have been convicted of a crime or crimes in any jurisdiction or jurisdictions "; or (3) that the applicant " has consorted or associated with bookmakers, touts, or persons of similar pursuits, or has himself engaged in similar pursuits "; or (4) that the applicant " is financially irresponsible "; or (5) that the applicant " has been guilty of or attempted any fraud or misrepresentation in connection with racing, breeding or otherwise "; or (6) that the applicant " has violated or attempted to violate any law with respect to racing in any jurisdiction or any rule, regulation or order of the commission, or shall have violated any rule of racing which shall have been approved or adopted by the commission, or has been guilty of or engaged in similar, related or like practices." (§ 9-b, subd. 2.)

We turn to the action taken by the commission in the 1954 proceeding. In complete disregard of the decision of the Court of Appeals annulling the determination of the joint board upon the ground that it was without authority to act because " the delegation by the Legislature of its licensing power to The Jockey Club, a private corporation, is such an abdication as to be patently an unconstitutional relinquishment of legislative power " (*Matter of Fink* v. *Cole,* 302 N. Y. 216, 225, *supra*), the present commission proceeded to pass upon the 1954 application as if our highest court had not made its decision. In its answer, the commission states " That the Commission thereupon considered anew the proof in the [1949 proceeding] * * * and the decision made therein written by the Chairman of the Commission and adopted by the other members of the Commission and reaffirmed the said decision ". Thus, the present commission appears to have completely ignored the decision of our highest court and instead of bowing to the mandate thereof that the 1949 decision of the prior joint board was a nullity, it boldly undertook to consider anew the prior proof " and reaffirmed the said decision " that had been held to be a nullity.

It seems that such a determination is a flagrant disregard of both the opinion and decision of the Court of Appeals. The action of the commission can only be described as arbitrary and capricious. The evidence in the 1949 proceeding as well as the decision of the joint board lost all vitality by virtue of the ruling of the Court of Appeals and it would be a gross abuse, amounting to nullification of the constitutional principle there enunciated, to say that while the proceeding and the decision were ruled out of legitimate consideration, the evidence could be lifted out and, without more, become the entire basis and body of a like decision five years later. The evidence taken at the prior proceeding was as much of a nullity as the entire proceeding and constituted no proof at all.

It has been heretofore pointed out that the pertinent statute mandates the commission to make four affirmative " findings " before granting a license. Absent these four " findings ", the license must be denied. Similarly, it may refuse a license if it shall " find " the existence of any one of certain factual situations. It seems to us that upon the facts here presented, the commission was required to do something more than review the former proof, " reaffirm " the decision of a rump board and deny the license.

It is recognized that the statute before us does not require a hearing or the making of formal findings in the event of a refusal to issue a license. This being so, the decision of the commission may not be reviewed under the so-called " substantial evidence " rule (cf. *Matter of Burke* v. *Bromberger,* 300 N. Y. 248; *Matter of Humphrey* v. *State Ins. Fund,* 298 N. Y. 327, and *Matter of Miller* v. *Kling,* 291 N. Y. 65) because the decision under review in the language of section 1296 of the Civil Practice Act was not made " as the result of a hearing held, and at which evidence was taken, pursuant to statutory direction ".

The petitioner in this proceeding, however, not only seeks an order reviewing and annulling the determination of the commission but also asks for an order in the nature of mandamus directing the issuance of a license to him. This involves an inquiry as to whether there is clear and convincing proof that the discretion of the commission has been exercised arbitrarily, unfairly or capriciously. (Cf. *Matter of Marburg* v. *Cole,* 286 N. Y. 202, 208; *People ex rel. Empire City Trotting Club* v. *State Racing Comm.,* 190 N. Y. 311, and *People ex rel. Lodes* v. *Department of Health,* 189 N. Y. 187. See, generally, Benjamin on Administrative Adjudication, vol. 1, p. 352; Attorney-General

Goldstein on Judicial Review of Administrative Action, 2 Syracuse L. Rev., p. 200, also in N. Y. L. J., May 15, 16 and 17, 1951, pp. 1780, 1800 and 1822, and dissenting opinion of Judge Desmond in *Matter of Barry* v. *O'Connell,* 303 N. Y. 46, 58.)

Measured by these standards, we find in this record clear and convincing proof that the discretion of the commission has been exercised not only arbitrarily and capriciously, but in such a manner that it has sought to revitalize and "reaffirm" a decision that our highest court has held to be a nullity.

It has been heretofore stated that in our opinion the "proof" in the 1949 proceeding was improperly used as the basis for the present decision. There is no other proof in the record. It is obvious that the decision of the commission must be bottomed upon what might fairly be regarded as "proof", although it need not be limited by rules of evidence. Moreover, in some form there must be a finding — either formally made or by suitable notification to the applicant — for which the court can find the purported support and basis in the record in order that the court may determine whether or not the decision is arbitrary.

In this posture of the case, *Matter of Perpente* v. *Moss* (293 N. Y. 325) outlines the procedure. Therein it appeared that the petitioner on August 5, 1942, applied for an employment agent's license which was refused by the commissioner of licenses. This court on April 22, 1943, affirmed the determination of the commissioner. (*Matter of Perpente* v. *Moss,* 265 App. Div. 789.) An application for reargument or for leave to appeal to the Court of Appeals was denied. (*Matter of Perpente* v. *Moss,* 266 App. Div. 775.) On May 7, 1943, the petitioner made a new application to the commissioner for a license. On May 29, 1943, the latter notified the petitioner "'that * * * (the Commissioner's) original decision denying the application, which had been sustained by the Appellate Division, was adhered to.'" (293 N. Y. 325, 328.) The petitioner again sought relief in court to annul the determination of the commissioner and for a direction that a license be issued to him. Upon the return of the proceeding, Special Term denied the motion upon the ground that the question "'presented is controlled by the decision of the Appellate Division on the earlier application (*In re Perpente* v. *Moss*), 265 App. Div. 769.'" (293 N. Y. 325, 328.) We affirmed, by a divided court, without opinion. (*Matter of Perpente* v. *Moss,* 267 App. Div. 974.)

The Court of Appeals (293 N. Y. 325) dismissed the appeal upon the ground that the order appealed from did not finally determine the special proceeding. In its opinion, however, it

set forth certain definite standards of procedure for both the administrative agency and the courts. The statute there under consideration was similar to the one in this proceeding in that no formal hearing was required and the commissioner was not required to make formal findings. The court, after setting forth the pertinent facts and applicable statutory provisions, proceeded to say that " [t]he statute does not in express terms require that a formal hearing be held where no protest has been filed and perhaps no requirement for said hearing may be read into the statute by implication. * * * Nonetheless the application for a license is, in such case, to be denied only if it shall appear from an ' inspection or examination made by the said mayor or commissioner ' that one of the statutory grounds for denying the application exists. Refusal may not be arbitrary and the determination of the Commissioner is subject to review by the court. Though formal hearings and formal findings may not be required, a license may not be refused on the ground that the applicant ' is not a person of good character ' unless the applicant has fair opportunity to meet a challenge to his good character and unless the court of review is apprised of the basis for the finding against the applicant. The procedure of the Commissioner must conform to recognized standards of fairness and a record must be made which permits a review of the action of the Commissioner by the court. (*Matter of Elite Dairy Products* v. *Ten Eyck*, 271 N. Y. 488.) " (P. 329.)

Similarly, in *Matter of Newbrand* v. *City of Yonkers* (285 N. Y. 164), it appeared that the enactment under consideration provided neither for a hearing nor findings of fact. The court said, however, that " [t]he statute also omits any express provision defining the manner in which the Board must proceed in order to obtain the information or proof which will enable it to determine whether such fact has been established. But the nature of the right to a pension conferred by the law, under the specified circumstances, indicates unequivocally that the claimant must have fair opportunity to present both proof and argument to sustain the claim. We need not now define the nature or source of the information or proof upon which the Board of Trustees may act nor the procedure which the Board should adopt in order to give the claimant fair opportunity to establish the claim. It is sufficient now to decide that each claimant must be accorded a fair hearing and consideration of the claim and that, when a determination of the Board is challenged, a record must be presented which will enable the court to review the determination. (*Matter of Elite Dairy*

*Products, Inc.,* v. *Ten Eyck,* 271 N. Y. 488; *Matter of New York Water Service Corp.* v. *Water Power & Control Comm.,* 283 N. Y. 23.) '' (P. 177.)

The dissenting opinion dismisses *Matter of Perpente* v. *Moss* (293 N. Y. 325, *supra*) as merely sounding a caveat. It is stated that here the petitioner '' had a full hearing on his associations prior to 1949.'' (*Post,* p. 87.) The answer to this is that Perpente also had a full hearing on his original application. (*Matter of Perpente* v. *Moss,* 265 App. Div. 789, *supra,* record on appeal, fols. 85–118.) What the Court of Appeals condemned was exactly the procedure here followed. If doubt remained that the court was discussing rules applicable to a subsequent application, it is dispelled by the subsequent language of the court where it said (293 N. Y. 325, 329) that '' [w]e do not mean to imply that where the Commissioner has, upon sufficient evidence, determined that an applicant is not a person of good character and has denied his application the applicant may promptly file a new application and compel the Commissioner to re-examine the question. Usually there is room for the exercise of discretion whether the time has come for reconsideration. That may depend on many factors; the nature of the evidence originally examined and of the evidence offered when a new application is made; the ground for the denial of the first application, as well as the time that has elapsed since that denial. These and perhaps other questions still remain open.''

In summary, the law itself directs what the commission shall do if it '' shall find '' certain things and what it shall do if it '' shall find '' other things. (§ 9-b, subd. 2.) We take this all to mean, in the context of fair play which has almost become due process in our legal thinking, that there must be some enunciation by the commission of its finding and the basis for its finding, and that it must be bottomed upon something resembling proof. If then the evidence taken at the prior hearing is ruled out of consideration, the commission must consider the matter anew and make a fresh determination upon a record which permits a review of its action by the court.

We find it unnecessary to explore the area discussed in the dissenting opinion relating to the evils connected with running races and boxing and the lesser '' exposure to rascality in the conduct of harness racing '' (*post,* p. 86). All of these '' sports '' in the face of a history of corruption have been legalized by the Legislature. We are here dealing with '' the problem of reconciling, in the field of administrative action, democratic safeguards and standards of fair play with the

effective conduct of government." (Cf. Benjamin on Administrative Adjudication, vol. 1, p. 9.) A " history of corruption " should not blind us to the enunciated principle that " [t]he procedure of the * * * [Commission] must conform to recognized standards of fairness and a record must be made which permits a review of the action of the * * * (Commission) by the court." (*Matter of Perpente* v. *Moss,* 293 N. Y. 325, 329, *supra.*)

The order appealed from should be affirmed, with costs.

BOTEIN, J. (dissenting). Petitioner seeks an order in the nature of mandamus directing the issuance of an owner's racing license to him. The statute presently governing the issuance of such a license does not require a hearing or the filing of formal findings to sustain a refusal to grant such an application.

I adopt without reservation the excellent general statement in the majority opinion relating to the sweeping powers vouchsafed an administrative officer in passing upon an application for a license when, as here, there is no requirement for granting an applicant a hearing. It would seem that the broader the legislative grant of power to an administrative agency the narrower the margin for judicial review. And, as will be developed, it is evident that the Legislature designedly gave the Racing Commission as generous a delegation of licensing power as was possible.

I also accept the majority's particular conclusion that, meager though our area of review may be, if the proof in the 1949 proceeding is eliminated there remains no other evidence to sustain the Racing Commission's determination. But I think a fair and logical extension of this reasoning would dictate a further particular conclusion — that if the commission had the right to consider and did consider the proof in the 1949 proceeding, such proof was more than ample to justify its refusal to issue a license to petitioner.

At the 1949 hearing evidence was presented, through certificates of incorporation, showing that petitioner was a stockholder and associated with certain persons in several corporations organized for the primary purpose of betting on horse races, and in one instance operating a gambling casino. These business associates of petitioner were identified as book-makers by two police officers and by a special investigator. The police officers also testified that these associates and petitioner were reputed to be members of a group that bet on fixed races. Petitioner, although afforded the opportunity and represented by

able counsel, did not choose to cross-examine the police officials; nor did he call any of his close business associates to deny that they were book-makers. Upon this very proceeding he contents himself with a conclusory denial that he " ever associated, at least knowingly, with * * * bookmakers ".

The commission is expressly authorized by statute to refuse a license to an applicant who in the past has " consorted or associated with bookmakers, touts, or persons of similar pursuits " (§ 9-b; L. 1951, ch. 324). The first of the Commission's two basic findings was that petitioner had consorted in 1949 with book-makers and persons of similar pursuits. Only on a clear and convincing showing that the commission had exercised the unusually broad powers entrusted to it by the Legislature arbitrarily, unfairly or capriciously, may this court disturb its determination (*Matter of Marburg* v. *Cole,* 286 N. Y. 202, 208, and other authorities cited in majority opinion). Surely, if the commission had the right to consider the proof presented at the 1949 hearing, we could not say that its determination that petitioner had consorted with book-makers was reached arbitrarily, unfairly or capriciously — not even if it had been made on much weaker proof than was in fact adduced before the joint board.

It might be well at this point to dispose of the contention that the commission arbitrarily flouted the Court of Appeals decision in *Matter of Fink* v. *Cole* (302 N. Y. 216) as in so doing it will also be established that the commission did in fact consider the evidence in the 1949 proceeding and did not limit its consideration only to the joint board's dissolved decision. The commission, as it alleged in its answer, considered *anew* the proof presented at the 1949 hearing, and the record also shows that the commission " independently reviewed the facts ".

Of course, if the commission had merely presumed to reaffirm, reinstate or revitalize the extinguished decision of the extinct joint board, and no more, its action would be arbitrary and capricious and constitute a flagrant disregard of both the opinion and decision of the Court of Appeals. In fact, irrespective of any court decision striking down the joint board and its determination, the commission could not abdicate to anyone else its ultimate statutory responsibility of determining whether an applicant should be granted a license. However, in stating it had reaffirmed the joint board's decision the commission clearly meant that it had considered the evidence presented to the joint board and had come to the same conclusion. And so it is evident that the commission did not rest its determination in 1954 on the

abrogated decision of the joint board, but rather on the evidence painstakingly produced before that board.

I really part company with the majority only on its assumption that in *Matter of Fink* v. *Cole* (302 N. Y. 216, *supra*) the Court of Appeals not only nullified the 1949 determination of the joint board, but contemporaneously obliterated for all purposes the proof taken at its hearing. Essentially this is also the position of petitioner. His lawyer argued before the commission that the proof taken in 1949 " had been entirely wiped out ".

In basing its decision on the ground of a constitutional relinquishment of legislative power to a private corporation, the Court of Appeals never had occasion to consider the fairness of the hearing accorded the petitioner or the nature of the evidence adduced at that hearing. The joint board's determination was cancelled for technical reasons that never touched and had nothing whatsoever to do with the quality or quantity of the evidence presented at the hearing or with the fairness of the hearing. To say that such an ultimate decision also cancels out the proof adduced at a hearing is just as illogical as to hold that the condemnation of a dangerous building would also require the destruction of usable furniture contained in the building.

For in passing upon this 1954 application by petitioner the commission was entitled to consider relevant information from a variety of sources (*Matter of Agoglia* v. *Mulrooney,* 259 N. Y. 462, 465; *Matter of Barresi* v. *Biggs,* 203 App. Div. 2, 6; *People ex rel. Lodes* v. *Department of Health,* 189 N. Y. 187, 194; *Matter of Stachura* v. *O'Connell,* 271 App. Div. 162). " It might conduct its investigation in any manner it saw fit ". (*Matter of Stachura* v. *O'Connell, supra,* p. 164.)

In *Matter of Agoglia* v. *Mulrooney* (259 N. Y. 462, *supra*) the petitioner had sought to compel the issuance of a cabaret license through a peremptory writ of mandamus (the former equivalent of this type of article 78 application). The police commissioner, in an opposing affidavit, made some statements based on information and belief about the general character of the neighborhood and also stated his belief that the premises sought to be licensed were likely to become a breeding place for crime. He relied on two reports from two commanding officers of the precinct in which the proposed cabaret was to be located. The only statement he made about these reports was that they recommended disapproval of the application. The reports were not in the record nor was there any further reference to any portion of

their subject matter which might tend to provide some probative basis for the precinct commanders' conclusions. Nevertheless, in reversing the order granting a motion for a peremptory order of mandamus, the Court of Appeals referred to these reports as part of the basis upon which " the refusal of the Commissioner of Police to issue the license can hardly be said to have been capricious or unreasonable " (p. 465).

The commission, it would appear, could have denied petitioner a license upon adequate proof submitted only in the form of investigators' reports — provided the substance of such reports was so preserved and presented that a reviewing court could evaluate the evidence upon which the commission acted. Its investigators could have questioned the witnesses who testified at the 1949 hearing, examined the documents considered by the joint board and then submitted reports confined entirely to facts elicited in the 1949 hearing; and the commission could have acted ex parte on the basis of such reports. In such event petitioner would have been afforded less protection, by all juridical concepts, than he was given here — namely, the confrontation and cross-examination of witnesses, and the presentation of proof on his own behalf.

It will be granted that were petitioner entitled to a hearing on his 1954 application the commission could not take the proof in the 1949 proceeding, no matter how carefully it studied and considered such proof, as a substitute for a full and fair hearing. But, to repeat, petitioner is not entitled to another hearing on his 1954 application. Let us assume that petitioner in the course of a trial resulting in a reversal had made damaging admissions revealing himself as unfit to be given a racing license. The reversal would not destroy all of the evidence in the wake of the vacated judgment; and the commission could take cognizance of such testimony in passing upon an application for a license.

Having independently found on competent and adequate proof that petitioner had consorted with book-makers in 1949, the commission went on to consider his counsel's assertion that he no longer was consorting with persons of such pursuits. At Special Term the commission stated that it had conducted two investigations since 1949 that had turned up nothing detrimental to petitioner's character in the subsequent years. Nevertheless, as stated in the chairman's affidavit, the " Commission did not regard the mere passage of the scant few years since the court proceedings with respect to the 1949 application as exculpating the petitioner's association with bookmakers and persons of similar pursuits as borne out by the proof before the Commis-

sion." This was the second essential finding made by the commission.

We must appraise the fairness of the commission's action against the background of the applicable statutes, which have been fully set forth in the majority opinion.

At first reading this might appear to be a very harsh law. A person may be denied a license if he merely consorts with book-makers or persons of similar pursuit. There need be no showing of any association for illicit purposes or that the applicant participates actively or actually in book-making or allied activities. And a past infraction may forever debar him.

However, the Legislature clearly intended to adopt such stern measures to " insure that racing in this state was properly and honestly conducted " (*People ex rel. Empire City Trotting Club* v. *State Racing Comm.*, 190 N. Y. 31, 34). The legislative purpose can best be appreciated in the setting of the successive efforts to curb by statute the potential for corruption and venality in unregulated horse racing. Generations ago the courts of this State construed laws that even then were aimed at eliminating the evils that defiled the sport and that were " intended to guard and restrict it [horse racing] so as to prohibit the abuses that had hitherto existed " (*Grannan* v. *Westchester Racing Assn.*, 153 N. Y. 449, 462).

From such sordid experience the Legislature evidently found that corruption may flourish when gamblers who bet on the results of horse races consort with persons who have some control over the running of the horses. And it designedly set a standard of conduct for horse owners as rigid as Caesar set for his wife.

For example, apparently finding there was not as great an exposure to rascality in the conduct of harness racing, the Legislature empowered the Harness Racing Commission to refuse to issue or to revoke a license only for more serious, commonly understood transgressions, such as conviction of a crime involving moral turpitude, actually engaging in book-making or illegal gambling and other well-defined violations of racing rules and regulations (L. 1940, ch. 254, § 41-a, as added by L. 1953, ch. 391, § 8, as last amended by L. 1954, ch. 510, § 5, eff. April 16, 1954). But in the boxing sport, with a history of corruption paralleling that of horse racing, the licensing statute contains provisions quite similar to those which must govern the Racing Commission. It provides, among other things, for suspension, revocation or refusal to renew or issue a license if

the applicant consorts or has consorted with "bookmakers, gamblers or persons of similar pursuits" (L. 1920, ch. 912, § 17; as last amd. by L. 1952, ch. 666, § 15, eff. April 14, 1952).

Here again the evils to be guarded against give some indication of the dimensions of the discretion granted the commission by the Legislature. And here again there is involved the initial issuance of a license and not a revocation with all of the consequent dislocations.

The Legislature has given the commission the power to refuse a license if the applicant is not a person whose participation "will be consistent with the public interest, convenience or necessity and with the best interests of racing generally". (§ 9-b, subd. 2.) This is designedly a broad grant.

An owner of racing horses, who presumably has the power, to some extent at least, to control the outcome of races, is a magnet for all the undesirable elements who circle the sport. In the circumstances it is not for the courts to say that the commission acted capriciously or arbitrarily in holding that five years of good behavior is not sufficient earnest that petitioner will be able to shake off old associates who may whisper corrupt proposals.

The caveats sounded in *Matter of Perpente* v. *Moss* (293 N. Y. 325) and *Matter of Newbrand* v. *City of Yonkers* (285 N. Y. 164), amply quoted in the majority opinion, have not been disregarded here. In this case plaintiff had a full hearing on his associations prior to 1949. He was not entitled to a hearing on his 1954 application, but he was entitled to a fair consideration of his application by the commission. This he was given. His lawyer was heard at great length by the full commission, and his application was refused on the ground that he had consorted with book-makers in 1949 and that five years was not a sufficient "exculpatory" period. For the first finding the commission considered and relied on the proof in the 1949 hearing. For the second it relied on its judgment and experience, but only after two separate investigations had been made of petitioner's conduct in the years subsequent to 1949.

While the commission should have been more explicit in notifying petitioner of the grounds for its refusal of his application, petitioner was in nowise prejudiced by this omission. He and his counsel were at all times aware that the only grounds being considered by the commission for refusal of his application were the two mentioned in the preceding paragraph.

The order of Special Term should be reversed, the application of the petitioner denied and the proceeding dismissed.

PECK, P. J., and COHN, J., concur with BASTOW, J.; BOTEIN, J., dissents in opinion in which BREITEL, J., concurs.

Order affirmed, with $20 costs and disbursements to the respondent.